James **MINING** et al., Plaintiffs,

v.

Charles **WHEELER** et al., Defendants.

No. 20084–1.

United States District Court,
W. D. Missouri, W. D.

April 3, 1974.

Charles C. Shafer, Jr., Kansas City, Mo., for plaintiffs.

Dan G. Jackson, III, Associate City Counselor, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

Plaintiffs in this action,[1] several fire-fighters employed by the City of Kansas

---

1. Plaintiffs initially sought to have this suit designated a class action on behalf of the approximately nine hundred fire-fighters employed by the City of Kansas City. In their suggestions in support of their motion for summary judgment, however, they indicate that such designation "is not extremely vital." The plaintiffs' position, coupled with the difficulties inherent in a class action, make this Court reluctant to get involved in

City, Missouri, and their local union, seek to void certain provisions of the Kansas City Charter and the City's Personnel Rules which regulate the political activities of city employees. Jurisdiction is alleged to arise under 28 U.S.C.A. § 1343(3) based upon a cause of action under 42 U.S.C.A. § 1983. Their complaint contends that Sections 126 and 127 of the Charter and Personnel Rule 1.5 violate the First, Ninth, and Fourteenth Amendments of the United States Constitution. They pray that these provisions be declared unconstitutional and void, and that the defendants be permanently enjoined from enforcing the challenged sections.

The case was submitted on an agreed Stipulation of Facts, and pends before us on cross-motions for summary judgment. For the reasons stated below, this Court must dismiss the action without prejudice to further proceedings in the State courts of Missouri.

I.

The agreed stipulation of facts establishes that the individual plaintiffs are fire-fighters, employed by the City, as "classified employees," as that term is defined in Section 115 of the Charter. They are appointed at will, pursuant to Section A7.5 of the City's Administrative Code. Plaintiff Local 42 is an unincorporated labor association affiliated with the International Association of Fire Fighters, AFL–CIO. This Local represents approximately 850 of the City's 900 Fire Fighters.

The City is governed by a City Charter adopted by a vote of the people of said City, pursuant to the provisions of Article VI, Section 19 of the Constitution of the State of Missouri of 1945.

Pursuant to that Charter, the City Council has adopted an administrative code, ordinances and other rules and regulations for the government of the said City. Defendant Charles Wheeler is the duly elected Mayor of the City and defendant John L. Taylor was the duly appointed City Manager at the time this action was filed. The remaining individual defendants are duly elected members of the City Council.

Pursuant to Section 11 of the City Charter, the Mayor has all of the powers and duties of a member of the Council, and is president of the Council. Pursuant to Section 20 of the City Charter, the City Manager is the Chief Administrative Officer of the City; and pursuant to Section 21 of the City Charter, appoints and may remove all Directors of Departments and also all other officers except as otherwise provided in the Charter (Section 119). Neither the Council nor any of its committees or members has any authority to control the appointment or removal of any person to or from office or employment by the City Manager or any of his subordinates.

Section 126 of the City Charter, adopted by the electorate of the City on November 3, 1942, and popularly known as the Little Hatch Act, provides that:[2]

[A] No person shall solicit, orally or by letter, or otherwise, or be in any manner concerned in soliciting, any assessment, contribution or payment for any political purpose whatsoever from any officer or employee in the classified service of the city or from the city auditor, director of personnel or member of the personnel board.

[B] No officer, agent or employee of the city shall permit any such solic-

---

that question. Since the relief sought by the individual plaintiffs would, as a practical matter, extend to their fellow fire-fighters, we feel the need for a class action is obviated and in the exercise of our discretion refuse to so designate this suit. Cf. Kansas City, Mo. v. Williams, 205 F.2d 47, 52 (8th Cir. 1952), cert. den. 346 U.S. 826, 74 S.Ct. 45, 98 L.Ed. 351 (1953).

2. As written in the Charter, Section 126 is not subdivided in any manner. However, for purposes of clarity and reference throughout this opinion, we have subdivided the provisions and have given each subdivision a bracketed capital letter designation.

itation in any building or room occupied for the discharge of official duties of the city.

[C] No officer or employee in the classified service of the city, or auditor, director of personnel or member of the personnel board, shall directly or indirectly give, pay, lend or contribute any part of his salary or compensation or any money or other valuable thing to any person on account of, or to be applied to, the promotion of any political party or any political purpose whatsoever.

[D] No officer or employee of the city shall promote, remove, or reduce any other officer or employee, or promise or threaten to do so, for withholding or refusing to make any contribution for any political party or purpose, or for refusal to render any political service, and shall not directly or indirectly attempt to coerce, command or advise any other officer or employee to make any such contribution or render any such service.

[E] No officer or employee in the classified service of the city, or auditor, director of personnel or member of the personnel board, shall use his official authority or influence for the purpose of interfering with any election or any nomination for office, or affecting the result thereof.

[F] No officer or employee in the classified service of the city, or auditor, director of personnel or member of the personnel board, shall be a member or officer of any committee of any political party, or be ward committeeman or committeewoman, nor shall any such officer or employee, or auditor, director of personnel or member of the personnel board, solicit any person to vote for or against any candidate for public office, or "poll precincts" or be connected with other political work of similar character on behalf of any political organization, party or candidate. All such persons shall, however, retain the right to vote as they may choose and to express their opinions on all political subjects and candidates.

[G] No questions in any examination shall relate to political or religious opinions or affiliations, and no appointment, transfer, lay-off, promotion, reduction, suspension or removal shall be affected or influenced by such opinions or affiliations.

[H] No persons shall make any false statement, certificate, mark, rating or report with regard to any test, certification or appointment made under any provision of this article or in any manner commit or attempt to commit any fraud preventing the impartial execution of this article or any provision thereof.

[I] No person shall, directly or indirectly, give, render, pay, offer, solicit, or accept any money, service or other valuable consideration for or on account of any appointment, proposed appointment, promotion, or proposed promotion to, or any advantage in, a position in the service of the city.

[J] No employee of the personnel department, examiner, or other person shall defeat, deceive or obstruct any person in his right to examination, eligibility, certification, appointment or promotion under this article, or furnish to any person any special or secret information for the purpose of affecting the rights or prospects of any person with respect to employment in the classified service.

[K] Any officer or employee of the city who shall violate any of the provisions of this section shall be discharged forthwith from the city service. It shall be the duty of the person or persons with authority to discharge, to discharge any such offending person at once. Any elector of the city may bring suit to restrain the payment of compensation to any such offending officer or employee and as an additional remedy any such elector may also obtain a writ of mandamus to compel the dismissal of such offending officer or employee. Officers

or employees discharged by elector's mandamus, shall have no right of review of such action before the personnel board. Any person dismissed under this section shall, for a period of five (5) years, be ineligible for appointment to any position in the service of the city. Any person who shall willfully or through culpable negligence violate any of the provisions of this section shall, upon conviction thereof, be punished by a fine of not less than fifty dollars ($50.00) and not exceeding five hundred dollars ($500.00), or by imprisonment in the city prison for a term of not exceeding six (6) months, or by both such fine and imprisonment.

Section 127 of the City Charter provides that:

No person elected to the council shall, during the time for which elected, be appointed to any other office or position in the service of the city. Any appointive officer or employee of the city who shall become a candidate for nomination or election to any public office shall immediately forfeit the office or employment then held by him under the city.

The individual plaintiffs, as classified employees, are subject to the restrictions and penalties of Section 126 of the City Charter. Similarly, as appointive officers or employees, they are subject to the restrictions and penalty of Section 127 of the City Charter.

Pursuant to Section 116 of the City Charter, the City's Director of Personnel, with the concurrence of the City Manager, has promulgated certain Personnel Rules covering the conduct of all City employees, including Section 1.5 entitled "Prohibition of Political Activity and Discrimination." [3]

This litigation was obviously prompted by circumstances which occurred prior to the last Kansas City municipal election. Shortly before that election, defendant City Manager issued a letter, discussing political activity by city employees, which was intended for all classified employees, including the individual plaintiffs.[4]

---

3. Personnel Rule 1.5 provides:
   a. No person in the classified service, or seeking admission thereto, shall be appointed, promoted, demoted, removed, or advanced on any basis or for any reason other than qualification, merit and fitness for the service or lack thereof. (Charter, Sec. 116)
   b. No person shall use or promise to use, directly or indirectly, any official authority or influence, whether possessed or anticipated, to secure or attempt to secure for any person an appointment or advantage in appointment to a position in the classified service, or an increase in pay or other advantage in employment in any such position, for the purpose of influencing the vote or political action of any person. (Charter, Sec. 126)
   c. No appointive salaried officer or employee of the City shall be a member of any national, state, or local committee of a political party, or an officer or member of a committee of a partisan political club, or shall take part in the management of affairs of any political party or in any political campaign, except to exercise his right as a citizen privately to express his opinion and to cast his vote. (Charter, Sec. 126).

4. That letter read as follows:
   TO: All Department Heads
   An election campaign is about to start for positions on the City Council. For the most part, city employees are completely prohibited from participating in the campaign.
   The following is stated for your information and necessary action. Please make this information available to all employees under your supervision. These are not new regulations, but are based on charter provisions. Employees:
   1. May vote.
   2. May express privately their opinions on candidates (but such expressions of opinion should be confined to conversations in ordinary social contacts, not public speeches, and no employee shall urge any person to vote for or against any candidate).
   3. May not solicit contributions for candidates.
   4. May not contribute, directly or indirectly, money or any other valuable thing for a campaign.
   5. May not use or permit to be used city property for campaigning.
   6. May not be a member or an officer of a committee of a political party, or be a

At a regular meeting of the Firefighters Local Union No. 42 on December 1, 1970, particular union officials were authorized and instructed to prepare a list of questions regarding the "Local 42 Program" to ask of each candidate for city office and thereafter to make known to the union members the names of candidates whose answers to the questionnaire were most favorable to the union. On February 25, 1971, two Fire Captains, plaintiffs Taylor and Mining, mailed a letter to all Fire Stations reporting on interviews had with various candidates for city offices, to which was attached a list of names of those "that answered correctly and were consistent in their attitude" toward the union. That letter stated that "no suggestion is made as to whom you should vote for, only that these candidates are committed to programs you have requested." Attached to this letter was a list of the twelve councilmanic districts with the name of one candidate appearing for each district.[5]

ward committeeman or ward committeewoman.

7. May not participate in polling of precincts.

8. May not distribute campaign literature.

9. May not urge any person to vote for or against any candidate.

Article V, Section 126, in the City Charter, as amended, "Restrictions; forbidden practices and penalties" reads as follows:

" . . . No officer or employee in the classified service of the city, or auditor, director or personnel or member of the personnel board, shall use his official authority or influence for the purpose of interfering with any election or any nomination for office, or affecting the result thereof. No officer or employee in the classified service of the city, or auditor, director of personnel or member of the personnel board, shall be a member or officer of any committee of any political party, or be ward committeeman or committeewoman, nor shall any such officer or employee, or auditor, director of personnel or member of the personnel board, solicit any person to vote for or against any candidate for public office, or 'poll precincts' or be connected with other political work of similar character on behalf of any political organization, party or candidate. All such persons shall, however, retain the right to vote as they may choose and to express their opinions on all political subjects and candidates.

" . . . Any officer or employee of the city who shall violate any of the provisions of this section shall be discharged forthwith from the city service . . .

Any person dismissed under this section shall, for a period of five (5) years, be ineligible for appointment to any position in the service of the city."

No campaigning shall be permitted to take place in City Hall nor at work locations of city employees.

Yours very truly,
/S/ John L. Taylor
John L. Taylor
City Manager

5. The letter (attachment omitted) reads as follows:

To All Members:

In accordance to [sic] membership instructions, interviews of candidates for city offices have been held. These interviews were conducted by Local 42 officials and a second interview by officials of other unions. The same questions were asked at both interviews and the answers recorded on a prepared questionnaire. These questionnaires were returned to Local 42 where they were compared and cross checked to determine if their answers were consistent at both interviews. There were eight basic questions, such as parity for fire and police, collective bargaining, pension improvements, maintaining a 24 hour shift, elimination of residential requirements, injury benefits for heart condition, drivers for chief's cars, two men in ambulances, etc. Party affiliation, etc., was not considered. The answers to these questions and their commitment to support these proposed programs and to provide you their answers was the soul [sic] purpose of these interviews. The names listed on the attached sheet are those that answered correctly and were consistent in their attitude at both interviews. No name is listed at this time for Mayor, since both candidates will be on the ballot at the general election and we intend to talk to both at length. Further information regarding the mayorality candidate will be provided prior to the final election.

No suggestion is made as to whom you should vote for, only that these candidates are committed to programs you have requested.

Fraternally,
/S/ James S. Mining
James S. Mining
Secretary-Treasurer.

When the City Manager learned of the distribution of the letter, he held a hearing on the conduct of the two Fire Captains in the matters above described and, under date of May 7, 1971, issued a memorandum to James Halloran requesting of Mr. Halloran that the two Fire Captains be disciplined by a one week suspension.

When this suspension was ordered, the two Fire Captains appealed to the Personnel Board of Kansas City, Missouri. That Board concluded that the two Fire Captains had been "wrongfully suspended and that they should be reimbursed for any and all moneys withheld from wages, because of this suspension."[6]

The parties stipulated to the following circumstances:

(a) Pursuant to 26 U.S.C.A. § 41, individual plaintiffs can claim certain income tax deductions or credits on their federal income tax returns for contributions to political parties. However, those individual plaintiffs can not legally contribute to such political parties under Section 126 of the City Charter.

(b) The County of Jackson, State of Missouri, has duly adopted a Charter for the operation and management of said County. The filing for a County elective office by any individual plaintiff would result in the immediate forfeiture of such plaintiff's employment with the City.

(c) One individual plaintiff was asked to serve on a National Committee for the 1972 national elections. Upon advice of his attorney, he declined to serve because of Section 126 of the City Charter.

## II.

Plaintiffs' complaint challenges all provisions of Kansas City's "Little Hatch Act" on the ground that such provisions "sweep too broadly and prohibit

---

**6.** The decision of the Personnel Board read in part:

In his memorandum of May 7, 1971, and in his testimony before this Board City Manager Taylor took the position that whether the two complainants had violated Section 126 of the City Charter was not clear. It is readily apparent, to this Board at least, that the complainants were perilously close in their conduct above described to a violation of Section 126 of the Charter. We conclude, however, the City must have determined that the complainants were not in violation of Section 126; otherwise the mandate of the Charter would have required their "forthwith discharge." Although Section 126 was repeatedly referred to, and its breadth questioned, this Board finds that a violation of Section 126 has never been in issue in this case and that the propriety of the suspensions must not be tested against the nearness of a Section 126 violation (however perilously close).

This case must be decided on the conduct of the officers and the findings of City Manager John L. Taylor in his memorandum of May 7, 1971. His conclusion is quoted below:

"It is clear to me that there was a serious error of judgment on the part of these two Fire Captains. Their actions reflected discredit upon the municipal service and were a direct hinderance to the effective performance of the municipal government functions. Their actions were unbe- coming a Fire Captain and disciplinary action is necessary and desirable for the efficient conduct of the business of the City and for the best interests of the municipal government."

This Board finds that there is no evidence that the actions complained of in any way directly or indirectly hindered the effective performance of the municipal government functions. No evidence or standards of what conduct is becoming or unbecoming a Fire Captain were presented to this Board and, indeed, we find this to be too vague a charge to sustain a suspension.

The Board is, however, more troubled by City Manager Taylor's conclusion that the conduct of these officers "reflected discredit upon the municipal service;" if so, it would have indeed been a serious error of judgment on the part of complainants, warranting disciplinary action. The Board believes that it is common knowledge that this City can be justly proud of its merit system and the freedom of its employees from undue influence in areas of politics or other areas. An unwarranted attempt on the part of any City employee to influence in a prohibited manner conduct or attitude of another employee in an election would indeed be a discredit on the municipal services, but this Board believes that it is this area that Section 126 is designed to protect and since we have concluded that a violation of Section 126 is not an issue in these appeals, we pass the point.

political activity which is unrelated to the effective workings of the Fire Department or to any other of the city's departments." A similar broad claim was made in Elder v. Rampton, 360 F. Supp. 559 (D. Utah, 1972) aff'd. 413 U. S. 902, 93 S.Ct. 3062, 37 L.Ed.2d 1020 (1973), where an employee of the State of Utah attacked Utah's so-called "Little Hatch Act." The gravamen of the plaintiff's claim in that case was that the Utah law was 'overbroad in that it prohibits certain non-partisan political activities, including the campaigning for and holding of non-partisan public office in violation of the First and Fourteenth Amendments." 360 F.Supp. at 562. In considering plaintiff's claim, the three-judge District Court noted that:

[T]he liberal procedures for litigating overbroad statutes are appropriately applied only when "no readily apparent construction suggests itself as a vehicle for rehabilitating the [statute] in a single prosecution" or litigation. Gooding v. Wilson, supra, at [518], 521 of 405 U.S., 92 S.Ct. 1103, [31 L.Ed.2d 408] (1972), quoting Dombrowski v. Pfister, supra, at [479], 491 of 880 U.S., 85 S.Ct. 1116 [14 L.Ed.2d 22] (1965). [Additional citations omitted.] When a statute may be pruned of its overbreadth by one judicial determination, and especially a civil determination, then constitutionally protected prerogatives are relatively easily vindicated without allowing special standing, and special relief . . . . [Id at 563].

Applying those principles to the facts in *Elder*, the District Court concluded that:

The instant circumstance is unlike that of the typical claim of overbreadth involving vague statutory terms which could be saved only by an extensive judicial gloss. Plaintiff proposes a case of black or white overbreadth: the term "political" as used in the Utah law either includes partisan and nonpartisan or just partisan activities. If it is assumed, as plaintiff assumes, that "political" includes

non-partisan activities, then a single, civil proceeding may be brought by an appropriate plaintiff in state or federal court to decide the constitutionality of such an application. If it is assumed that the breadth of the statute is unclear as to non-partisan activities, the Utah court can appropriately interpret the statute, applying if it chooses, the "readily apparent construction [which] suggests itself as a vehicle for rehabilitating" the statute.

We therefore conclude that the statute's coverage of non-partisan activity is an issue not properly raised in this proceeding. [Id. at 563–564].

The Supreme Court affirmed. That affirmance, although on the Supreme Court's summary docket must be given appropriate consideration by this Court.

The circumstances presented in this case are strikingly similar to those presented in *Elder*. Many of the challenged provisions in the Kansas City Charter, like the Utah statute, merely refer to "political" activities without further elaboration. Those provisions have not been authoritatively construed by any State court or even by a responsible city official. Compare Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 993 (1973).

Consideration of the numerous Supreme Court decisions dealing with abstention in First Amendment cases, including those cited and applied in *Elder*, requires that we must conclude that this Court must abstain if the constitutional defects, if any, of the Kansas City provisions can be "rehabilitated" by some "readily apparent construction" in a State court action, to borrow *Elder's* language.

### III.

■ Federal, state, and local governments have the "right to place evenhanded restrictions on the partisan political conduct" of their employees, inasmuch as "such restrictions serve valid and important state interests." Broadrick v. Oklahoma, *supra*, at 606, 93 S.Ct.

at 2913. See also United Public Workers v. Mitchell, 330 U.S. 75, 99–103, 67 S.Ct. 556, 91 L.Ed. 754 (1947); United States Civil Service Commission v. National Association of Lettercarriers, 413 U.S. 548, 554–567, 93 S.Ct. 2880, 37 L. Ed.2d 796 (1973).

The Supreme Court has concluded that governmental employees may be forbidden from:

> [s]oliciting contributions for partisan candidates, political parties, or other partisan political purposes; becoming members of national, state, or local committees of political parties, or officers or committee members in partisan political clubs, or candidates to any paid public office; taking part in the management or affairs of any political party's partisan political campaign; serving as delegates or alternates to caucauses or conventions of political parties; addressing or taking an active part in partisan political rallies or meetings; soliciting votes or assisting voters at the polls or helping in a partisan effort to get voters at the polls; participating in the distribution of partisan campaign literature; initiating or circulating partisan nominating petitions; or riding in caravans for any political party or partisan political candidate. [Broadrick v. Oklahoma, *supra*, 413 at 616–617, 93 S.Ct. at 2918. See also C.S.C. v. Lettercarriers, *supra*, 413 at 556, 93 S.Ct. 2880.]

But the power of the legislature to regulate the political conduct of government employees must be exercised "within reasonable limits." UPW v. Mitchell, *supra*, 330 U.S. at 102, 67 S.Ct. 556. While the precise scope of those limits has never been explicitly spelled out, it is clear that the regulations must be related to the governmental interests which support legislative intrusion into "what otherwise would be the freedom of the civil servant under the First,

Ninth and Tenth Amendments." Id. at 95. In both the federal and state systems, for example, the motivating factors underlying the imposition of limitations were to insure that the civil service was neither "employed to build a powerful, invincible, and perhaps corrupt political machine" nor imbued with "bias or favoritism for or against any political party." CSC v. Lettercarriers, *supra*, 413 U.S. at 565, 93 S.Ct. at 2890. Thus, in dealing with challenges to limiting provisions, various cases have carefully considered the particular statute together with any attendant interpretive gloss it may have received in order to insure that the limitations may fairly be said to be directed against identifiable partisan conduct. See UPW v. Mitchell, *supra* 330 U.S. at 100, 67 S.Ct. 556; CSC v. Lettercarriers, *supra*, 413 U.S. at 571–576, 93 S.Ct. 2880; and Broadrick v. Oklahoma, *supra*, 413 U.S. at 617–618, 93 S.Ct. 2908. When the clear thrust of a particular statute is not so directed serious questions of overbreadth arise. Cf. Broadrick v. Oklahoma, *supra*, 413 U.S. at 627–628, 93 S. Ct. 2908 (Brennan, J., dissenting); Elder v. Rampton, *supra*, 360 F.Supp. at 563; Lecci v. Cahn, 360 F.Supp. 759, 767–768 (E.D.N.Y.1973); and Gray v. Toledo, 323 F.Supp. 1281, 1287 (N.D. Ohio 1971).

It is clear that various portions of the Kansas City Charter challenged by the plaintiffs[7] contain language similar to that approved in two recent Supreme Court cases. See Broadrick v. Oklahoma supra, 413 U.S. at 603, n. 1, 93 S.Ct. 2908; CSC v. Lettercarriers, supra, 413 at 550, 93 S.Ct. 2880. Other portions of the Kansas City Charter, however, are written in much broader language. Subdivision A of Section 126, for example, prohibits the solicitation of city employees "for any political purpose whatsoever . . ." Subdivision C prohibits classified employees from con-

---

**7.** Though the plaintiffs have not explicitly so indicated, their pleadings and briefs clearly imply that they do not challenge substantial portions of Section 126, namely, subdivisions B, D, E, G, H, I, J, or K. Similarly, they do not challenge that portion of Section 127 which applies to city councilmen.

tribution for "the promotion of any political party or any political purpose whatsoever." Subdivision F places prohibitions on participation: 1) as "a member of officer of any committee of any political party;" 2) as "a ward committeeman or committeewoman;" 3) in soliciting "any person to vote for or against any candidate for public office;" 4) in "polling precincts;" 5) by being "connected with other political work of similar character on behalf of any political organization, party, or candidate." In a similar fashion, the latter sentence of Section 127 provides for immediate forfeiture of employment by any city employee who becomes "a candidate for nomination or election to any public office . . .".

Unlike the provisions approved by the applicable Supreme Court cases, however, the apparently broad language of the Charter we have just noted has not been limited in any way by regulation,[8] administrative interpretation,[9] or State court decision. Further, the record discloses no attempt to obtain such a clarification. Yet, as the cases mentioned above indicate, acceptable narrowing constructions can be and have been placed on similar statutes.

■■■ This Court lacks jurisdiction to authoritatively construe these provisions since this power lies exclusively with the State. Gooding v. Wilson, *supra*, 405 U.S. at 526, 92 S.Ct. 1103. But we can, to use the language of *Elder*,

conceive of "readily apparent constructions" which could cure, or at least, substantially reduce the alleged overbreadth of the Cha_ 'er. For example, the challenged provisions may be interpreted as applying only to city elections, where both the interests and regulatory power of the City are most firmly established.[10] In view of the possibilities of reasonable constructions which could limit the broad language attacked, and the absence of a definitive State construction, we conclude that we must abstain from further consideration of Subdivisions A, C, and F of Section 126 and Section 127 of the Charter.

### IV.

■■ Plaintiffs also attack the same Charter provisions on the ground of vagueness. As we have noted, the language of the Kansas City Charter is quite similar to that considered by the Supreme Court in Broadrick v. Oklahoma and CSC v. Lettercarriers, The Court there concluded that:

> [T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest. CSC v. Lettercar-

---

8. In *Lettercarriers*, the Court found that the generalized language of Section 9(a) of the Hatch Act, 5 U.S.C. § 7324(a), had been narrowly defined by the extensive regulations found in 5 CFR Part 733. See 413 U.S. at 575, 93 S.Ct. 2880. In this case, the only pertinent regulation is Personnel Rule 1.5 which if anything, is written in even more broad and general language than the Charter itself. See n. 3, *supra*.

9. The Court in *Broadrick* relied on the fact that the provisions of the Oklahoma statute, which was phrased simply in terms of "political" activity, had been interpreted by the State's Attorney General to apply only to "clearly partisan political activity." See 413 U.S. at 617–618, 93 S.Ct. 2908. Even if we were to consider the City Manager's letter

in this case to be an administrative interpretation of the Charter, it does nothing to limit the apparent scope of the Kansas City Charter's broad language. See n. 4 *supra*.

10. We do not mean to say that this is the only possible construction which may be placed on these provisions. It is possible that the provisions would be limited to "partisan" activities, as in *Broadrick* and *Lettercarriers*. The question of whether the prohibition of party names on the ballot implicitly established a "non-partisan" form of government, and the question of what is actually meant by those who have advocated such a view, although the subject of not infrequent political debate, has never been judicially determined.

riers, *supra* at 578–579, 93 S.Ct. at 2897.

Application of that principle requires that we find and conclude that plaintiffs' contention that the challenged provisions are unconstitutionally vague is untenable.   See also United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 74 L.Ed. 508 (1930); and Elder v. Rampton, *supra*, 360 F.Supp. at 564.

### V.

For the reasons stated, it is

Ordered that plaintiffs' complaint should be and the same is hereby dismissed without prejudice to further appropriate proceedings in the courts of Missouri.