Robert T. MAGILL et al., Plaintiffs, Appellees,

v.

Dennis M. LYNCH et al., Defendants, Appellants.

No. 76–1532.

United States Court of Appeals, First Circuit.

Argued March 3, 1977.

Decided July 25, 1977.

William F. McMahon, Providence, R. I., and Moses Kando, Pawtucket, R. I., was on brief, for defendants, appellants.

Amato A. DeLuca, Warwick, R. I., with whom Shiela Cabral-Souza, Providence, R. I., was on brief, for plaintiffs, appellees.

Before COFFIN, Chief Judge, MOORE * and ALDRICH, Circuit Judges.

COFFIN, Chief Judge.

The plaintiffs in this case are Pawtucket, Rhode Island firemen who ran for city office in 1975. The defendants are city officials who threatened to enforce the city's "Little Hatch Act" against the firemen if they ran. Pawtucket's counterpart to the federal Hatch Act prohibits city employees from engaging in a broad range of political activities. Becoming a candidate for any city office is specifically proscribed.[1] Pawtucket's elections are, by charter, held in odd years, and do not utilize party nominating machinery or make reference to party labels in the election itself. The federal district court granted a preliminary injunction ordering the defendants not to penalize the plaintiffs for their campaigns. Plaintiff Healy's pursuit of a city council seat ended with his defeat in the primary. Plaintiff Magill's campaign for mayor survived the primary, only to founder in the general election. Some time later, the district court made its preliminary injunction final.[2] This appeal followed.

The question before us is whether Pawtucket's charter provision, which bars a city employee's candidacy in even a nonpartisan city election, is constitutional. The issue compels us to extrapolate two recent Supreme Court decisions, *Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) and *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Both dealt with laws barring civil servants from partisan political activity. *Letter Carriers* reaffirmed *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), upholding the constitutionality of the Hatch Act as to federal employees. *Broadrick* sustained Oklahoma's "Little Hatch Act" against constitutional attack, limiting its holding to Oklahoma's con-

* Of the Second Circuit, sitting by designation.

1. The relevant charter provisions read as follows:

"(5) No appointed official, employee or member of any board or commission of the city, shall be a member of any national, state or local committee of a political party or organization, or an officer or a member of a partisan political organization, or take part in a political campaign, except his right privately to express his opinion and to cast his vote.

(6) No appointed official or employee of the city and no member of any board or commission shall be a candidate for nomination or election to any public office, whether city, state or federal, except elected members of boards or commissions running for re-election, unless he shall have first resigned his then employment or office." Pawtucket, R.I., Charter, art. VIII, ch. 1, § 8–115(5) & (6) (1974).

"(1) A violation of any of the prohibitions of chapter 1 of this article shall be a misdemeanor, punishable by a fine of not more than three hundred dollars or by imprisonment for not more than ninety days, or both, and if the violator is an officer or employee of the city, by removal from office or immediate dismissal." *Id.,* art. VIII, ch. 2, § 8–201.

The charter also bars city employees from holding another public office, *id.,* ch. 1, § 8–102, a prohibition without relevance to these plaintiffs, who lost their election bids. The charter forbids employees to solicit political contributions, *id.,* § 8–115(3), but there is no suggestion that these employees violated this provision, and the district judge did not include it in his discussion of the charter provisions at issue in this case.

2. Although the plaintiffs lost their election bids while the preliminary injunction was in effect, we do not think this case is moot. The plaintiffs were candidates when they filed their complaint and they ran for office after the injunctive was entered. They may still be punished for these activities. Pawtucket, R.I., Charter, art. VIII, ch. 2, § 8–201 (1974). The injunction now in effect prevents the defendants from "imposing upon Plaintiffs any penalties . . . as a result of Plaintiffs' campaigns . . . ." This order, by standing between the plaintiffs and punishment for their candidacies, has a continuing effect and saves the case from mootness. Moreover, the injunction is so worded as to protect the plaintiffs should they again seek public office.

struction that the Act barred only activity in partisan politics.[3] In *Mancuso v. Taft,* 476 F.2d 187, 200 (1st Cir. 1973), we assumed that proscriptions of candidacy in nonpartisan elections would not be constitutional. *Letter Carriers* and *Broadrick* compel new analysis.

The Pawtucket charter, a comprehensive document endorsed by the voters in 1953 and revised in 1966, attempts to make elections for mayor and city council nonpartisan. This intent is expressed by the charter's structuring of the election process. Elections are held in off years, when few state or federal contests are held, to minimize coattail campaigning. Candidates are nominated by petitions that may be signed by any city elector no matter what his party affiliation. The number of nominated candidates is narrowed to two for each office by a primary election open to all voters; and the surviving candidates run against each other in the general election. The candidates' party affiliations do not appear on the ballot. In short, so far as the laws of Pawtucket can make them, these elections are nonpartisan.

But institutions exist in their cultural context. And in Pawtucket the context has historically been partisan. The stipulations of the parties and uncontradicted testimony presented by the defendants paint this picture of elections in Pawtucket. The city has two political parties, Democratic and Republican. These parties regularly endorse candidates in the primary and general elections. The endorsements are frequently solicited by candidates at party meetings; and the Democratic endorsement in particular, is highly prized. Plaintiff Magill himself appeared at one Democratic endorsement meeting, where he urged those present to support him, though he did not formally request an endorsement. For the past decade, the chairman of the city's Democratic committee has been the mayor. At the last election he was opposed by the chairman of the city's Republican committee, as well as by plaintiff Magill. Many regular Democratic workers who serve in partisan statewide campaigns also give aid to endorsed Democratic candidates in the city elections. The 1975 campaign illustrates how pervasive is the influence of political parties on city elections. Twelve officials were to be elected in that year: a mayor, three councilmen-at-large, two school committee members, and six councilmen. Originally, thirty candidates were nominated for these posts. Only twelve of the thirty were endorsed by the Democratic committee. All twelve survived the primary, and ten were ultimately elected. Every successful candidate—except one, who was not endorsed by the Democrats—had advertised his endorsement or political affiliation in the city's newspaper.

The district court took note of this ambivalent character of the Pawtucket system. It took as its objective the task of determining whether the system was partisan or not. It also relied on our First Amendment analysis in *Mancuso,* and looked for compelling city interests that could not be served by less restrictive alternatives. It observed that the city's interests were less compelling than were the government's interests in *Letter Carriers* and *Broadrick,* there be-

---

**3.** The federal statute explicitly permits nonpartisan political activity:

> "7326. Nonpartisan political activity permitted—Section 7324(a)(2) of this title does not prohibit political activity in connection with—
>
> (1) an election and the preceding campaign if none of the candidates is to be nominated or elected at that election as representing a party any of whose candidates for presidential elector received votes in the last preceding election at which presidential electors were selected; or
>
> (2) a question which is not specifically identified with a National or State political party or political party of a territory or possession of the United States." 5 U.S.C. § 7326.

The Oklahoma statute is not so expressly limited. It prohibits, among other things, soliciting "for any political organization, candidacy or other political purpose" as well as becoming "a candidate for nomination or election to any paid public office." *Broadrick,* 413 U.S. at 606, 93 S.Ct. at 2912. Nonetheless, the state's Attorney General has interpreted the law as prohibiting only "clearly partisan political activity". *Id.* at 617, 93 S.Ct. 2908.

ing less likelihood that adherence to a state or national party platform could influence municipal policy, little danger of creation of a powerful and possibly corrupt political machine, and little prospect of city employees using their office to influence voters. The court stressed the facts that no party label appeared in the ballot, therefore making it more difficult to vote a straight party ticket; that anyone could sign nominating petitions and could vote in the primary elections; and that there was no pattern of automatic party support. It concluded "That elections for municipal offices in Pawtucket, while not completely sterilized from contact with party politics, are in fact substantially non-partisan in character" and that the dangers of partisan political activity are not a compelling justification for the charter restrictions.

Appellees contend that the district court's finding of nonpartisanship must stand unless clearly erroneous. We do not see our standard of review in this light. Of course all of the subsidiary facts are uncontroverted and many are stipulated. The court's characterization of Pawtucket's municipal elections as "substantially non-partisan" also seems to be a fair and supported summary description. But the critical question is whether Pawtucket is constitutionally prohibited from barring city employees from being candidates for mayor and city council in the kind of municipal elections revealed in this record, even though the elections be characterized as nonpartisan.

In *Letter Carriers* and *Broadrick* the statutes involved, either as written or as construed, *see* n. 3 *supra,* proscribed only partisan activities. The Court therefore was not called upon to deal with the constitutionality of efforts to limit or prohibit political activity in elections which could be called nonpartisan, and indeed painstakingly and almost without exception confined its strictures to "partisan" elections.

▮ What we are obligated to do in this case, as the district court recognized, is

to apply the Court's interest balancing approach to the kind of nonpartisan election revealed in this record. We believe that the district court found more residual vigor in our opinion in *Mancuso v. Taft, supra,* than remains after *Letter Carriers.* We have particular reference to our view that political candidacy was a fundamental interest which could be trenched upon only if less restrictive alternatives were not available. 476 F.2d at 196, 198–200. While this approach may still be viable for citizens who are not government employees, the Court in *Letter Carriers* recognized that the government's interest in regulating both the conduct and speech of its employees differs significantly from its interest in regulating those of the citizenry in general. Not only was *United Public Workers v. Mitchell supra,* 330 U.S. at 75, 67 S.Ct. 556, "unhesitatingly" reaffirmed, 413 U.S. at 556, 93 S.Ct. 2880,[4] but the Court gave little weight to the argument that prohibitions against the coercion of government employees were a less drastic means to the same end, deferring to the judgment of the Congress. *Id.* at 566–567, 93 S.Ct. 2880. We cannot be more precise than the Third Circuit in characterizing the Court's approach as "some sort of 'balancing' process", *Alderman v. Philadelphia Housing Authority,* 496 F.2d 164, 171 n. 45 (1974). It appears that the government may place limits on campaigning by public employees if the limits substantially serve government interests that are "important" enough to outweigh the employees' First Amendment rights. 413 U.S. at 564, 93 S.Ct. 2880. Applying this balancing approach, we cannot say that Pawtucket's interests were not sufficiently important. The analysis differs somewhat because the focus is local rather than national.

▮ In *Letter Carriers* the first interest identified by the Court was that of an efficient government, faithful to the Congress rather than to party. The district court discounted this interest, reasoning

4. One of the points made by the dissent in *Letter Carriers* was the approval apparently accorded by the majority to the "rational ba-

sis" standard of *Mitchell.* 413 U.S. at 596–597, 93 S.Ct. 2880.

that candidates in a local election would not likely be committed to a state or national platform. This observation undoubtedly has substance insofar as allegiance to broad policy positions is concerned. But a different kind of possible political intrusion into efficient administration could be thought to threaten municipal government: not into broad policy decisions, but into the particulars of administration—favoritism in minute decisions affecting welfare, tax assessments, municipal contracts and purchasing, hiring, zoning, licensing, and inspections. Just as the Court in *Letter Carriers* identified a second governmental interest in the avoidance of the appearance of "political justice" as to policy, *id.* at 565, 93 S.Ct. 2880, so there is an equivalent interest in avoiding the appearance of political preferment in privileges, concessions, and benefits. The appearance (or reality) of favoritism that the charter's authors evidently feared is not exorcised by the nonpartisan character of the formal election process. Where, as here, party support is a key to successful campaigning, and party rivalry is the norm, the city might reasonably fear that politically active bureaucrats would use their official power to help political friends and hurt political foes. This is not to say that the city's interest in visibly fair and effective administration necessarily justifies a blanket prohibition of all employee campaigning; if parties are not heavily involved in a campaign, the danger of favoritism is less, for neither friend nor foe is as easily identified.

■ A second major governmental interest identified in *Letter Carriers* was avoiding the danger of a powerful political machine. The Court had in mind the large and growing federal bureaucracy and its partisan potential. The district court felt this was only a minor threat since parties had no control over nominations. But in fact candidates sought party endorsements, and party endorsements proved to be highly effective both in determining who would emerge from the primary election and who would be elected in the final election. Under the prevailing customs, known party affiliation and support were highly significant factors in Pawtucket elections. The charter's authors might reasonably have feared that a politically active public work force would give the incumbent party, and the incumbent workers, an unbreakable grasp on the reins of power. In municipal elections especially, the small size of the electorate and the limited powers of local government may inhibit the growth of interest groups powerful enough to outbalance the weight of a partisan work force. Even when nonpartisan issues and candidacies are at stake, isolated government employees may seek to influence voters or their co-workers improperly; but a more real danger is that a central party structure will mass the scattered powers of government workers behind a single party platform or slate. Occasional misuse of the public trust to pursue private political ends is tolerable, especially because the political views of individual employees may balance each other out. But party discipline eliminates this diversity and tends to make abuse systematic. Instead of a handful of employees pressured into advancing their immediate superior's political ambitions, the entire government work force may be expected to turn out for many candidates in every election. In Pawtucket, where parties are a continuing presence in political campaigns, a carefully orchestrated use of city employees in support of the incumbent party's candidates is possible. The danger is scarcely lessened by the openness of Pawtucket's nominating procedure or the lack of party labels on its ballots.

■ The third area of proper governmental interest in *Letter Carriers* was ensuring that employees achieve advancement on their merits and that they be free from both coercion and the prospect of favor from political activity. The district court did not address this factor, but looked only to the possibility of a civil servant using his position to influence voters, and held this to be no more of a threat than in the most nonpartisan of elections. But we think that the possibility of coercion of employees by superiors remains as strong a factor in municipal elections as it was in *Letter Carriers*.

Once again, it is the systematic and coordinated exploitation of public servants for political ends that a legislature is most likely to see as the primary threat of employees' rights. Political oppression of public employees will be rare in an entirely nonpartisan system. Some superiors may be inclined to ride herd on the politics of their employees even in a nonpartisan context, but without party officials looking over their shoulders most supervisors will prefer to let employees go their own ways.

 In short, the government may constitutionally restrict its employees' participation in nominally nonpartisan elections if political parties play a large role in the campaigns.[5] In the absence of substantial party involvement, on the other hand, the interests identified by the *Letter Carriers* Court lose much of their force. While the employees' First Amendment rights would normally outbalance these diminished interests, we do not suggest that they would always do so. Even when parties are absent, many employee campaigns might be thought to endanger at least one strong public interest, an interest that looms larger in the context of municipal elections than it does in the national elections considered in *Letter Carriers.* The city could reasonably fear the prospect of a subordinate running directly against his superior or running for a position that confers great power over his superior. An employee of a federal agency who seeks a Congressional seat poses less of a direct challenge to the command and discipline of his agency than a fireman or policeman who runs for mayor or city council. The possibilities of internal discussion, cliques, and political bargaining, should an employee gather substantial political support, are considerable. *Cf. Pickering v. Board of Education,* 391 U.S. 563, 570, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Hobbs v. Thompson,* 448 F.2d 456, 470 (5th Cir. 1971).

 This brings us to the question the district court did not have to decide— whether the charter provisions are overbroad. A well-known exception to the rule that litigants may attack a statute only as it applies to them, the doctrine of overbreadth allows one whose acts may constitutionally be regulated to attack the regulation on the ground that it unconstitutionally regulates others. *See generally,* Note, *The First Amendment Overbreadth Doctrine,* 83 Harv.L.Rev. 844 (1970). Overbreadth analysis is ordinarily invoked when a statute touches on significant First Amendment concerns. *Id.* The doctrine stems from a judicial fear that invalid laws will too often deter protected speech if they are not quickly struck down. Candidacy is a First Amendment freedom. *Mancuso v. Taft, supra,* 476 F.2d at 195–197. Pawtucket bans both partisan and nonpartisan candidacies in no uncertain terms; it forbids its employees to run for "any public office, whether city, state or federal". Pawtucket, R.I., Charter, art. VIII, ch. 1, § 8–115(6).[6]

---

**5.** We realize that this will not always be an easy line to draw. As we recognized in *Mancuso v. Taft, supra,* 476 F.2d at 200, "the line between nonpartisan and partisan can often be blurred by systems whose true characters are disguised by the names given them by their architects". But we do not think any brighter line would do justice to both government and employees. The interests identified by the *Letter Carriers* Court drive us past the stopping place chosen by the district court. The convenience of the judiciary is not a sufficient reason for restricting otherwise protected conduct or for narrowing the scope of an otherwise constitutional law. We are not convinced in any event that much certainty would be gained if we relied exclusively on how the city labels its elections. In other cities, partisan and nonpartisan elements will surely be more ambiguously mixed; and in some places, certain offices may be exempted by tradition from party struggle even though party designations are allowed on the ballot.

**6.** A separate provision tells city employees not to "take part in a political campaign". Pawtucket, R.I., Charter, art. VIII, ch. 1, § 8–115(5). In the light of the more specific prohibition of candidacy, *id.* § 8–115(6), we doubt that this provision was meant to cover candidates. *See Mancuso v. Taft, supra,* 476 F.2d at 189 n. 1. Moreover, a state court could authoritatively construe "political" to mean "partisan", eliminating with one stroke any overbreadth problem. On the day it issued its opinions in *Broadrick* and *Letter Carriers,* the Supreme Court summarily affirmed a decision that used this reasoning to turn back an overbreadth attack

This provision is therefore open to overbreadth attack.

■ The governing case is *Broadrick,* which introduced the doctrine of "substantial" overbreadth in a closely analogous case. Under *Broadrick,* when one who challenges a law has engaged in constitutionally unprotected conduct (rather than unprotected speech) and when the challenged law is aimed at unprotected conduct, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." 413 U.S. at 615, 93 S.Ct. at 2918. Two major uncertainties attend the doctrine: how to distinguish speech from conduct, and how to define "substantial" overbreadth. We are spared the first inquiry by *Broadrick* itself. The plaintiffs in that case had solicited support for a candidate, and they were subject to discipline under a law proscribing a wide range of activities, including soliciting contributions for political candidates and becoming a candidate. The Court found that this combination required a substantial overbreadth approach. The facts of this case are so similar that we may reach the same result without worrying unduly about the sometimes opaque distinction between speech and conduct.

■ The second difficulty is not so easily disposed of. *Broadrick* found no substantial overbreadth in a statute restricting partisan campaigning. Pawtucket has gone further, banning participation in nonpartisan campaigns as well. Measuring the substantiality of a statute's overbreadth apparently requires, *inter alia,* a rough balancing of the number of valid applications compared to the number of potentially invalid applications. *Cf. The Supreme Court—1972 Term,* 87 Harv.L.Rev. 1, 150–152 (1973).

Some sensitivity to reality is needed; an invalid application that is far-fetched does not deserve as much weight as one that is probable. The question is a matter of degree; it will never be possible to say that a ratio of one invalid to nine valid applications makes a law substantially overbroad. Still, an overbreadth challenger has a duty to provide the court with some idea of the number of potentially invalid applications the statute permits. Often, simply reading the statute in the light of common experience or litigated cases will suggest a number of probable invalid applications. *See, e. g., Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). But this case is different. Whether the statute is overbroad depends in large part on the number of elections that are insulated from party rivalry yet closed to Pawtucket employees. For all the record shows, every one of the city, state, or federal elections in Pawtucket is actively contested by political parties. Certainly the record suggests that parties play a major role even in campaigns that often are entirely nonpartisan in other cities. School committee candidates, for example, are endorsed by the local Democratic committee.

■ The state of the record does not permit us to find overbreadth; indeed such a step is not to be taken lightly, much less to be taken in the dark. On the other hand, the entire focus below, in the short period before the election was held, was on the constitutionality of the statute as applied. Plaintiffs may very well feel that further efforts are not justified, but they should be afforded the opportunity to demonstrate that the charter forecloses access to a significant number of offices, the candidacy

in a case that is indistinguishable from this one. *Elder v. Rampton,* 413 U.S. 902, 93 S.Ct. 3062, 37 L.Ed.2d 1020 (1973), *affirming* 360 F.Supp. 559 (D.Utah 1972) (three-judge court) (statute proscribing "political" activity could be construed to bar only partisan activity). *See Mining v. Wheeler,* 378 F.Supp. 1115 (W.D.Mo. 1974). *See also* n. 3 *supra.* We cannot rule on the constitutionality of this provision in the absence of a clarifying state court interpretation of its reach. In *Elder,* the district court

apparently rendered a final judgment against the employees because of the open question of state law. 360 F.Supp. at 565. The better course might well be to stay the proceeding while retaining jurisdiction, or to certify the controlling question of state law. *See, e. g., Harrison v. NAACP,* 360 U.S. 167, 179, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959). We must remand the case in any event, and we leave this question to the district court.

for which by municipal employees would not pose the possible threats to government efficiency and integrity which *Letter Carriers,* as we have interpreted it, deems significant. Accordingly, we remand for consideration of plaintiffs' overbreadth claim.

*The judgment is vacated and the cause remanded to the district court for further proceedings in accordance with this opinion.*