ENTERED OCT 2 8 2014

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-11-428

*3/31/2014*

KAREN CALLAGHAN, et al.,

    Plaintiffs,

v.

                          ORDER

CITY OF SOUTH PORTLAND,

    Defendant.

Before the court is plaintiffs' application for attorneys fees. Specifically, the plaintiffs are seeking an award of fees and costs in a total amount of $ 85,204.40. This includes their original request for attorney's fees and costs of $ 81,296.90, plus an additional amount of $ 3,907.50 sought for their work in responding to the City's objections to their original fee request.

The parties appear to agree that, as prevailing parties on constitutional claims brought under 42 U.S.C. § 1983, plaintiffs are entitled to their reasonable attorneys fees pursuant to 42 U.S.C. § 1988. What constitutes a reasonable fee is determined through the lodestar method – determining the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008).[1]

In determining the lodestar, the court may eliminate time that was "unreasonably, unnecessarily, or inefficiently devoted to the case" and may disallow hours claimed "if it determines that the time is insufficiently documented." Torres-

---

[1] Courts previously also looked to a 12-factor test originally set forth by the Fifth Circuit in Johnson v. Georgia Highway Express, 488 F.2d 714, 717-19 (5th Cir. 1974). However, in more recent fee decisions under 42 U.S.C. § 1988, the Supreme Court has abandoned the Johnson factors in favor of the lodestar approach. See Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 550-52 (2010).

Rivera v. O'Neill-Cancel, 524 F.3d at 336, citing Hensley, 461 U.S. at 433-34; Bangs v. Town of Wells, 2003 ME 129 ¶ 20, 834 A.2d 955. The court must also consider the results obtained and adjust the fee award downward if time was spent on unsuccessful claims. Hensley, 461 U.S. at 434-35. Bangs v. Town of Wells, 2003 ME 129 ¶ 20.

In this case the City contends that the award to plaintiffs for fees and costs should be reduced to somewhere in the neighborhood of $ 16,700 – a reduction amounting to approximately 80 percent of the amount sought. The City contends (1) that many of the hours of work for which fees have been sought were excessive, redundant, or unnecessary, (2) that the time for which fees are sought has been inadequately documented, (3) that the hourly rate sought by plaintiffs is too high, and (4) that the fee award should be reduced by what the City characterizes as plaintiffs' limited success in the lawsuit.

Each of the City's criticisms is considered below. On all these issues, it bears emphasis that, as the Supreme Court has observed, the essential goal "is to do rough justice, not to achieve auditing perfection." Fox v. Vice, 131 S.Ct. 2205, 2216 (2011).


1. Successful Outcome

The City's first argument that plaintiffs achieved only limited success in this action is based on the Law Court's ruling that the relief should be limited to the two named plaintiffs. Callaghan v. City of South Portland, 2013 ME 78 ¶¶ 35-36.

Plaintiffs originally sought injunctive relief precluding the City from enforcing the challenged personnel policy as against the two plaintiffs and a declaratory judgment declaring the policy unconstitutional as applied to any city employees seeking nomination or election to the School Board or engaging in campaign activity in

2

connection with School Board elections.[2] This court, in ruling for plaintiffs, granted declaratory and injunctive relief that was not limited to the two named plaintiffs. Such relief was granted because at no point during the original Superior Court proceedings did the City raise an argument that if any relief were awarded, it should be limited to the two named plaintiffs.

The court has reviewed the briefs on appeal as well as the memoranda of law filed in this court and can find no argument or discussion by either plaintiffs or the City relating to whether relief should be limited to the two named plaintiffs. At all times both parties focused solely on the merits of the constitutional claims.

What this means is that none of the time spent by plaintiffs' counsel can be ascribed to the broader relief which the Law Court vacated after affirming the relief awarded to the individual plaintiffs. As a result, the court cannot reduce plaintiffs' award based on time spent on unsuccessful claims.

The City's second argument with respect to lack of success is that since relief ultimately was only awarded to the two named plaintiffs and one of the two named plaintiffs has now left City employment, the societal importance of the rights vindicated here was "virtually absent." City's Opposition to Motion for Attorneys Fees dated January 10, 2014 at 14-15. The problem with this argument is that the City strenuously litigated every aspect of this case, moving for reconsideration before the Law Court even after relief had been limited to the two named plaintiffs and then seeking to have the decision vacated on remand. The court can only assume that this was because of the precedential effect of the Law Court's ruling – even after the only specific relief awarded was limited to the named plaintiffs.

---

[2] See plaintiffs' complaint and the proposed order submitted by plaintiffs with their motion for summary judgment.

3

Given that the City defended this case with such vigor, the court cannot agree with its subsequent attempt to downplay the success achieved. No reduction in the attorneys fee award will be made based on the City's contention that only limited success was achieved.

## 2. Allegedly Redundant or Unnecessary Work

The City challenges certain specific categories of the time spent by David Lourie, trial and appellate counsel for plaintiff, as redundant, duplicative, or unnecessary. According to the court's calculations, Mr. Lourie is seeking compensation for 215.8 hours not including time spent in connection with the fee application, which will be separately addressed below.

First, the City contends that no fees should be awarded for work on plaintiffs' application for a TRO because that motion was denied. The denial was entered after it became evident that no school board seats were going to be contested in the upcoming election – information which Mr. Lourie communicated to the court in an October 14, 2011 letter. The TRO was not denied based on the merits or on any failure of proof by plaintiffs.

The court agrees that it became evident at some point while Mr. Lourie was drafting TRO reply papers that there was no need for a TRO and will therefore reduce the compensable hours spent on the TRO by 10.0 hours. The remaining time on the TRO involved legal and factual work on issues that were eventually litigated on the motion for summary judgment. The time spent on those issues in connection with the TRO necessarily reduced the billable time that Mr. Lourie spent later in the litigation. As a result, the remaining time will not be disallowed.

4

Second, the City challenges time spent by Mr. Lourie in drafting a response to the City's motion for reconsideration in the Law Court. M.R.App.P. 14(b)(1) specifically provides, "No response to a motion for reconsideration shall be filed unless requested by the Law Court." Mr. Lourie could have waited to see if any response was requested, and his motion for leave to file an unsolicited response was denied. The court will disallow 10.8 hours representing the time spent on the response to the motion for reconsideration.

Third, the City challenges the time spent in responding to the Kevin Adams affidavit. Where the City submitted an affidavit offering new evidence after plaintiffs had responded to the City's initial objection to the order proposed by the court on remand, Mr. Lourie was entitled to submit a supplemental response. Moreover, the court considered and relied on that response to some extent in its November 26, 2013 order. No time will be disallowed on this issue.

The City also challenges time spent by Mr. Lourie in consulting with ACLU counsel, time spent in a few miscellaneous categories, and a small amount of time spent on what the City characterizes as clerical tasks. The court generally agrees that time spent consulting with ACLU counsel should not be disallowed just because the ACLU ended up filing an amicus briefs although it agrees that some of that consultation (including a second moot court) appears excessive. Part of the difficulty here is that the court cannot discern from the billing summary provided how much time was spent in consulting with ACLU counsel and for what purpose – an issue that will be addressed further below in connection with the City's claim that Mr. Lourie's time was inadequately documented. The court will disallow a total of 4.0 hours in connection

5

with the City's challenges to consultation with ACLU counsel and in response to City's objections to time allegedly spent on clerical and other non-compensable tasks.[3]

The above reductions result in a figure of 191.0 hours for compensable time spent by Mr. Lourie prior to his work on the fee application.

### 3. Inadequate Documentation

The City also proposes a 25 percent reduction in the time otherwise deemed compensable because of what the City contends are inadequacies in documentation. In particular, the City notes numerous instances where Mr. Lourie's billing summary includes generic entries such as "legal research" on unspecified issues, "telephone conference" on unspecified subjects, "exchange email with clients" on unspecified subjects, and on at least two occasions "exchange email" with both addressee and subject unspecified.[4]

Where other entries in the billing summary demonstrate that Mr. Lourie was contemporaneously drafting an affidavit for one of his clients, the court is willing to conclude that a generic reference to "email with client" in that same time frame involved the affidavit being drafted. Similarly, when other entries in the billing summary demonstrate that Mr. Lourie was preparing a legal memorandum in connection with a specific motion, the court is willing to conclude that a generic reference to "legal research" in that same time frame involved research on the issues raised in the motion. In other instances, however, the court is left with only the generic

---

[3] This includes .1 hour that the plaintiffs concede should not have been sought and .5 hours listed on September 22, 2013 in connection with an FOAA request.

[4] See, e.g., entries for November 22 and December 5, 2011. One problem is that Mr. Lourie's billing summary often records only a daily total of time spent on a number of different activities, making it impossible to determine how much time was spent on a particular task or issue. See Gratz v. Bollinger, 353 F.Supp.2d 929, 939 (E.D. Mich. 2005) (discussing problems with "block billing").

6

entry and virtually no ability to assess whether the time spent was necessary, reasonable, or redundant.

Where overly generic time records have been offered, the court may discount or disallow the hours claimed. Torres-Rivera v. O'Neill-Cancel, 524 F.3d at 336, 340; Tennessee Gas Pipeline Co. v. 104 Acres of Land, 32 F.3d 632, 634 (1st Cir 1994). Under the circumstances of this case, the court will reduce Mr. Lourie's compensable hours (after the deductions set forth above) by 10 percent. This reduction shall not be applied to the time spent by Mr. Lourie on plaintiffs' fee application because those hours are being separately adjusted on other grounds, and because there are fewer problems with generic entries in connection with Mr. Lourie's time spent on the fee application.

The 10 percent reduction results in 171.9 hours of compensable time for Mr. Lourie, not including time spent on the fee application.

## 4. Fee Application

Mr. Lourie did not represent plaintiffs on the fee application in this case. Instead he obtained representation from Attorney Richard O'Meara. However, both Mr. Lourie and Mr. O'Meara have sought compensation for the time spent in pursuing the fee application. As far as the court can tell from his billing summary, Mr. Lourie seeks 20.8 hours on the original fee application plus 3.9 hours in responding to the City's objections. Mr. O'Meara seeks compensation for 15.6 hours on the original fee application plus 8.8 hours in responding to the City's objections. Plaintiffs also seek recovery for 5.2 hours of paralegal time (at $100 per hour) in preparing the billing summary attached as Exhibit A to the Lourie Affidavit from the handwritten hourly time records kept by Mr. Lourie.

7

The City raises a number of objections: (1) that because Mr. Lourie obtained separate counsel, there was a lot of duplicative work, (2) that Mr. O'Meara had to spend unnecessary time familiarizing himself with the case, and (3) that a lower hourly rate should be applied for fee petition work in keeping with decisions suggesting that time spent on fee requests may be compensated at a lower rate than time spent litigating the merits of the case. See Torres-Rivera v. O'Neill-Cancel, 524 F.3d at 340.

Courts have questioned the use of new counsel to prosecute a fee request and have suggested that this leads to duplicative work and work that would not have been necessary if trial counsel had prosecuted its own fee application. See Rogers v. Okin, 821 F.2d 22, 30 (1st Cir. 1987); Shadis v. Beal, 703 F.2d 71, 73 (3d Cir. 1983).[5]

In this instance Mr. Lourie justifies the need for special fee counsel because, he contends, he has limited experience in preparing fee petitions, because he thought he might have to testify at a hearing with respect to fees, and because he thought new counsel might be able to obtain a settlement as to fees after his own relationship with counsel for the City had deteriorated. January 17, 2014 Lourie Affidavit ¶ 9.

The first two of those contentions do not justify the retention of special fee counsel and the duplication that necessarily results. According to his December 20, 2013 affidavit ¶¶ 3-4, a considerable portion of Mr. Lourie's practice involves lawsuits under 42 U.S.C § 1983 and Mr. Lourie has prosecuted a number of fee applications in the past. See, e.g., Mowles v. Maine Commission on Governmental Ethics, Docket No. AP-06-35 (Superior Ct. Cumberland, order of April 10, 2009), reported at 2009 WL 1747859; Maietta Construction Inc. v. Wainwright, CV-02-59 (Superior Ct. Cumberland) (order of

[5] In Rogers v. Okin, the First Circuit dropped a footnote stating that while specially retained fee counsel may be appropriate in some cases, "such a practice is inherently wasteful in many respects and should not be encouraged by the district courts in the absence of good cause." 821 F.2d at 30 n.4.

8

July 29, 2003) reported at 2003 WL 23148892. In addition, the court sees no basis for Mr. Lourie's suggestion that he might have had to testify.

The court agrees that there could have been a basis for the retention of special fee counsel in order to explore settlement, but Mr. O'Meara's time records indicate that he had expended only 2.7 hours when he sent a final settlement demand and another .3 hours reviewing the City's response. All of the remainder of Mr. O'Meara's time was spent in litigating the fee request.

The court has reviewed the remaining time sought by Mr. O'Meara and all the time sought by Mr. Lourie in connection with the fee application and concludes that substantial duplication of effort was necessarily involved when both attorneys were working on fee application issues and that the court will therefore deduct 50 percent of the attorney hours sought in connection with the fee application. This means that the court will allow 12.4 of the fee application hours sought by Mr. Lourie, and 13.7 of the hours sought by Mr. O'Meara (which includes the 3.0 hours ascribed to settlement efforts). Both of those figures include time spent in responding to the City's objection to the fee application. The court will allow all 5.2 hours of the paralegal time creating the billing summary.

As set forth below, the court is generally adjusting Attorney Lourie's requested hourly rate. Since it has already halved the time for which fees will be awarded in connection with the fee request, the court will not apply a lower hourly rate for time spent on the fee request and sees no reason to address whether Mr. O'Meara's requested hourly rate should be adjusted.[6]

---

[6] Applying a lower hourly rate for the fee request could constitute an alternative basis for the court's ruling this issue. See Desena v. LePage, 847 F.Supp.2d 207, 213 (D. Me. 2012) (cutting hourly rate awarded for fee application work in half).

9

## 5. Hourly Rate

Mr. Lourie is seeking an hourly rate of $ 325 and has submitted affidavits supporting the position that this falls within the prevailing market rate for an attorney of Mr. Lourie's qualifications litigating § 1983 cases. The City argues that this rate is too high, based on awards in other cases and a document which it contends establishes that Mr. Lourie's usual hourly rate is $250.

Plaintiffs argue that the document in question is inadmissible pursuant to M.R.Evid. 408 because it was provided in the context of settlement negotiations. Rather than resolve that issue, the court will disregard the document. It nevertheless concludes that the hourly rate for the fee award to Mr. Lourie should be adjusted downward for several reasons.

First, Mr. Lourie has not provided any information as to his usual hourly rate, preferring to rely solely on his estimate and the estimate of other lawyers who have provided affidavits as to "a prevailing market rate." First Circuit case law with respect to fee applications states that a party seeking a fee award has the burden of producing materials supporting the request and that this includes "information anent the law firm's standard billing rates." Hutchinson v. Patrick, 636 F.3d 1, 13 (1st Cir. 2011). The court is not bound by a lawyer's standard billing rate but the standard billing rate is a starting point, see Brewster v. Dukakis, 3 F.3d 488, 492 (1st Cir. 1993), and the court will infer from Mr. Lourie's failure to provide that rate that he does not usually charge $ 325 per hour.

Second, disparities in rates, even among the lawyers who submitted affidavits, presumably reflects skill and experience but may also reflect differences in overhead expenses. A lawyer's hourly rate is derived in part from overhead, and Mr. Lourie's

10

overhead may be significantly lower than that of the affiants.[7] By way of example, Mr. Lourie did not have a computerized billing system – which necessitated the paralegal expenses involved in creating the billing summary annexed to his December 10 affidavit as Exhibit A.

Finally, there is evidence in at least one prior case that undercuts the requested hourly rate of $325. In Mowles v. Maine Commission on Governmental Ethics, AP-06-35 (Superior Ct. Cumberland), Mr. Lourie sought and was awarded attorneys fees at an hourly rate of $235, which was found to be within the prevailing market rate in 2009 for an attorney of Mr. Lourie's qualifications. April 10, 2009 order, reported at 2009 WL 1747859. The court is entitled to rely on its own knowledge of attorneys fees in the relevant area, Andrade v. Jamestown Housing Authority, 82 F.3d 1179, 1190 (1st Cir. 1996), and finds that while billing rates may have increased since 2009, any increases have been closer to 15 percent than the 38 percent required to increase a billing rate of $235 to a rate of $325.

For the above reasons, and based on its knowledge of market rates generally, the court finds that the prevailing rate to be applied to Mr. Lourie's successful efforts in this case is $270 per hour.

### 6. Westlaw Charges

The last issue in dispute involves plaintiffs' request for an award of $ 4,051.90 for Westlaw research costs. On this issue the court finds that Mr. Lourie's explanation of those expenses and the Westlaw records submitted with Mr. Lourie's reply affidavit are not comprehensible and do not support the request.

---

[7] The court is also constrained to note that the affiants, who are all involved in fee-generating work, have an incentive to have fee awards set at a rate at which they would seek to be compensated.

11

The records attached to Mr. Lourie's reply affidavit are strangely formatted and set forth different figures for the amounts charged. By way of example, for March 2012 plaintiffs are seeking $ 198.00, but the printout for that month shows a figure of "24.08 USD" for the Callaghan case in the extreme right hand column. As far as the court can tell from the Westlaw bills that the City submitted for comparison, the extreme right hand column is the actual amount charged.

Mr. Lourie's December 10, 2013 affidavit indicates that his monthly Westlaw fee was capped and that he has "conservatively estimated" that Westlaw research on this case accounted for 75 percent of his usage. However, for October 2011 (a month for which Mr. Lourie is seeking 75 percent of his capped fee), the printout appears to show 29 Callaghan Westlaw transactions out of 135 total Westlaw transactions – which would appear to suggest that this case accounted for 20 percent, not 75 percent, of the Westlaw usage that month.

Finally, plaintiffs are seeking $ 2,301.00 in Westlaw expenses for the twelve months ending December 17, 2013 – even though the Law Court argument took place on December 12, 2012 and the only activity that took place during the ensuing 12 months was the drafting of a response to the City's motion for reconsideration (already disallowed) and certain proceedings commenced by this court's November 7, 2013 order after the Law Court remand. Mr. Lourie does not explain why the $ 2,301.00 figure was selected or why so much Westlaw time was used during the period in question, and the relevant printout sets forth various figures including "0.00 USD" in the extreme right hand column.

The Westlaw charges are disallowed.

In sum, plaintiffs are entitled to attorney's fees for 171.9 hours of Mr. Lourie's time prior to the fee application and 12.4 hours of Mr. Lourie's time in connection with the fee application at an hourly rate of $270 resulting in a total attorney's fee to Mr. Lourie of $ 49,761.00. Plaintiffs are also entitled to attorney's fees for 13.7 hours of Mr. O'Meara's time at an hourly rate of $300 and 5.2 hours of paralegal time at $100 per hour for an additional amount of $ 4,660.00. Finally, after disallowing the Westlaw expenses requested, plaintiffs are entitled to costs of $ 350.00.

The entry shall be:

Plaintiffs are awarded attorneys fees of $ 54,421.00 and costs of $ 350.00. The clerk is directed to incorporate this order in the docket pursuant to Rule 79(a).

Dated: March _31_, 2014

Thomas D. Warren
Justice, Superior Court

13

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

3/31/2014

SALLY DAGGETT ESQ
JENSEN BAIRD GARDNER HENRY
PO BOX 4510
PORTLAND, ME 04112      Def Attorney

---

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

DAVID LOURIE ESQ      Plff Attorney
189 SPURWINK AVENUE
CAPE ELIZABETH ME 04107

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-11-428

KAREN CALLAGHAN, et al.,

Plaintiffs,

v.

ORDER

STATE OF MAINE
Cumberland, ss, Clerk's Office

APR 17 2012

RECEIVED

CITY OF SOUTH PORTLAND,

Defendant.

In this action plaintiffs Karen Callaghan and Burton Edwards, who are part-time employees of the City of South Portland, challenge the constitutionality of certain provisions of a South Portland personnel policy that restrict the ability of city employees to run for the school board or to engage in certain political activity supporting or opposing candidates for the school board.

Before the court is plaintiffs' motion for summary judgment. In response, South Portland argues that summary judgment should be granted in favor of the City. *See* M.R.Civ.P. 56(c). Neither party argues that there are any factual disputes requiring a trial.

1. Summary Judgment

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. *E.g., Johnson v. McNeil*, 2002 ME 99 ¶ 8, 800 A.2d 702, 704. The facts must be considered in the light most favorable to the non-moving party. *Id.* Thus, for purposes of

summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Rodrigue v. Rodrigue*, 1997 ME 99 ¶ 8, 694 A.2d 924, 926.

2.    Material Facts

The following facts are undisputed:

Plaintiff Karen Callaghan has been employed as a part-time librarian in the South Portland Library Department since 2001.  Callaghan was elected to the South Portland School Board in 2007.

On November 15, 2010 South Portland, which had previously banned municipal employees from seeking election to the City Council or engaging in political activity in connection with municipal elections, extended those prohibitions to bar political activity by city employees in connection with school board elections.  It did so by amending its personnel policy in November 2010 to prohibit municipal employees from seeking or accepting nomination or election to any position on the school board, from "using the influence of their employment capacity for or against any candidate" for the school board, from signing or circulating petitions or campaign literature in connection with school board elections, and from soliciting or receiving any contributions or "political service . . . for any political purpose pertaining to South Portland city and school government."   *See* November 2010 Personnel Policy at 33, Section X(B), Conditions of Employment – Political Activity (Exhibit 2 to Gailey Aff.).

Shortly after that amendment, there was a vacancy on the school board when a member of that board resigned.  At that time plaintiff Burton Edwards, who is a part-

2

time employee in the City's Parks and Recreation Department, expressed interest in being appointed to the vacancy by the City Council. The City Clerk, Susan Mooney, pointed out the prohibition contained in Section X(B) of the November 15, 2010 personnel policy, and Edwards decided not to seek appointment.

In the summer of 2011 Callaghan collected signatures to place herself on the ballot to be re-elected to the school board. On September 16, 2011 the City Clerk – relying on the amendment to Section X(B) – advised Callaghan that because she had not resigned her City employment, her name would not be placed on the ballot.

Three days later – after communications between Callaghan's attorney and an attorney for the City – the City Manager informed Callaghan by letter that the City did not agree with Callaghan's arguments that the City personnel policy was unconstitutional as applied to Callaghan's re-election to the school board. However, the City Manager's letter added that he recognized that an argument could be made that, as a serving member of the school board, Callaghan was "grandfathered" from the prohibition contained in the amended personnel policy and concluded,

> For now, I am willing to give you the benefit of the doubt and to not further pursue the application of amended Section X(B) of the City's Personnel Policy to you at this time.

Approximately one week later, Callaghan and Edwards filed this action and sought a TRO. Callaghan argued that her right to run for the school board should not depend on the discretion of the City Manager, and Edwards argued that his right to participate in any campaigning relating to school board elections was being chilled by South Portland's policy. By order dated October 27, 2011, the court ruled that there was insufficient urgency to justify a TRO but that a preliminary injunction hearing would be scheduled. However, plaintiff's counsel thereafter advised the court that because none

3

of the candidates for school board were opposed, a preliminary injunction hearing was not necessary.

Callaghan was subsequently elected to a second term on the school board at the November 8, 2011 election. That term began on December 5, 2011.

On November 21, 2011 the City issued an amended Personnel Policy which changed the November 2010 policy in several respects that are pertinent to this action.[1] The November 2011 policy continued the prohibition on City employees seeking nomination or election to the school board. It no longer prohibited city employees from signing petitions but retained the prohibition on circulating petitions and campaign literature for "any City elective office" (defined to include School Board as well as City Council elections) and retained other restrictions on political activity relating to school board elections.[2]

Section X(B) of the policy, as amended and currently in effect, provides as follows:

B.    Political Activity

While in the employ of the City, an employee shall not:

(1)    seek or accept nomination or election to any South Portland elective office (i.e., City Council or School Board) (hereinafter "City elective office");
(2)    use the influence of his or her employment capacity for or against any candidate for any City elective office;

---

[1] The parties devote some effort to the issue of whether this lawsuit was in any way a catalyst for the November 2011 amendments to Section X(B) of the Personnel Policy. This issue may become relevant to any future application for attorneys' fees but is irrelevant to the question of whether the City's Personnel Policy – as amended in November 2011 – passes constitutional muster. In determining whether plaintiffs are entitled to equitable relief, the court is obliged to consider the Personnel Policy in its current form. *Cf. United States v. The Schooner Peggy*, 5 U.S. 103, 110 (1801).

[2] The previous policy had applied more broadly to activity "for any political purpose." *See* Gailey Aff Ex. 2 at 33. The prior policy thus would have applied to school referenda as well as candidate elections. The policy currently in effect applies only to candidate elections.

4

(3)     circulate petitions or campaign literature for any City elective office;

(4)     solicit or receive subscriptions, contributions or political service from any person for or against any candidate for any City elective office; or

(5)     use City facilities, equipment, materials or supplies to communicate, organize, assist or advocate for or against any candidate for any county, state, federal or City elective office regardless of whether he or she is on or off duty.

Subsections (1) through (4) above shall not apply to any City employee holding City elective office if that term commences on or before December 5, 2011, subject, nonetheless, to the limitations in subsection (5) above and in the City Charter; provided, however, that subsections (1) through (5) above shall apply to any City employee whose City elective term of office would commence on or after December 6, 2011.

This provision is not to be construed to prevent City employees from becoming, or continuing to be, members of any political organization; from attending political organization meetings; from donating personal time, services or resources to a political cause; from expressing their views on political matters; or from voting with complete freedom in any election.

Employees who are working directly or indirectly under a federal funding status must check with the Hatch Act Unit of the U.S. Office of Special Counsel as to the extent to which participation in state or federal political activity is allowed under Federal law.

Gailey Aff. Exhibit 3 at 37-38.

The personnel policy in question applies to all employees appointed by the City Manager or his designees unless otherwise provided in collective bargaining agreements, the City Charter, or state or federal law. *See* Gailey Aff. Ex. 3, Section II(A). It does not apply to school department employees, who are under the direction of the school superintendent. *See* 20-A M.R.S. § 1055(10).[3]

School board elections, like other municipal elections in South Portland, are non-partisan. The school board's function is to manage the schools. 20-A M.R.S. § 1001(2).

---

[3] The record in this case contains no information with respect to any restrictions that may exist on the political activities of school department employees, and this order does not address any issues that may exist with respect to such political activities.

This involves setting school policies, submitting an annual school budget for approval by the City Council, and selecting and discharging the school superintendent. Gailey Aff. ¶ 17; 20-A M.R.S. §§ 1001(3), 1052. Aside from the School Superintendent, school board members do not have direct management or supervisory authority over other employees of the school department. More importantly for purposes of this case, school board members have no management, supervisory, or policy authority over the City Manager or any of the city employees who are subject to the South Portland Personnel Policy that is the subject of this action.

There is some interaction between the school board and the City Manager with respect to the school budget and the issuance of debt on behalf of the school department, and the City Manager is entitled to request budget estimates and other financial reports from the school board. Gailey Aff. ¶¶ 18-19.

The City Manager has no supervisory authority over school board members in their school board capacity. However, if school board members are also city employees (as in the case of Callaghan), the City Manager could be involved at the final step in the grievance process if disciplinary proceedings are ever brought against a city employee who was also on the school board. Gailey Aff. ¶ 14.

Finally, there are also some functions and costs that are shared by the school department and other municipal departments. There is one outside auditor for both school and city finances, and there is one workers compensation insurer for both the School Department and other municipal departments. The City makes bulk purchases for the School Department as well as other municipal departments, and certain information technology functions of the School Department and other municipal departments are in the process of being consolidated. Gailey Aff. ¶¶ 21-22, 24.

6

3.    Standing

No party has raised the issue of standing or suggested that plaintiffs lack standing in this case. Although Callaghan, based on her recent election, is expressly exempted from Section X(B) of the personnel policy with respect to her current term on the school board that began on December 5, 2011, she will be subject to Section X(B) if she seeks another term in 2014. If a vacancy occurs on the school board before the next municipal election, the issue of whether someone who is a city employee could seek or accept the position would immediately arise, as it did when Edwards expressed interest in a vacancy in December 2010.[4] Moreover, city employees who are not themselves seeking election to the school board but who might have children in the schools and who might therefore wish to engage in political activity on behalf of school board candidates are also prohibited from circulating petitions or campaign literature and soliciting or receiving contributions or "political service" for any school board candidate. *See* Personnel Policy as amended November 2011, Section X(B)(3), (4).[5]

Because seeking election to the school board and circulating campaign literature for school board candidates are unquestionably First Amendment activities and since

---

[4] In the event of a vacancy, the City Charter provides that the City Counsel shall elect a member to serve until the next regular municipal election, at which time all of school board members shall be elected by the voters. *See* City Charter, Art. IX § 904.

[5] The existing policy prohibits circulating petitions or campaign literature in connection with a school board election and also prohibits soliciting or receiving contributions or "political service" in connection with such elections. At the same time the policy allows city employees to devote "personal time, services or resources to a political cause" – which would appear to include school board elections. Given the principle that restrictions on First Amendment rights are narrowly construed, the personnel policy can therefore be interpreted to allow city employees to contribute their time to a school board election, presumably by campaigning for school board candidates – so long as they do not circulate any campaign literature for those candidates. This is a difficult distinction to defend. With respect to contributions, the policy would appear to allow city employees to make contributions ("donate resources") to school board candidates but not to solicit or receive such contributions.

The City may have intended to preclude any contributions or campaign activity in connection with municipal or school board elections – allowing such activity only with respect to other elections – but the existing policy does not draw that distinction.

7

the existence of Section X(B) will certainly deter such activities,[6] city employees such as Callaghan and Edwards are entitled to know if the city may validly regulate such activities under Section X(B). It also makes sense to resolve this issue before a school board election is imminent. Once an election is imminent, the personnel policy will have a chilling effect on the First Amendment rights of city employees who may wish to be involved in school board elections, and it is appropriate to resolve the validity of that policy in advance.

4.    Standard of Review

There is no dispute that running for an elective school board position constitutes First Amendment activity. There is also no dispute that circulating petitions and campaign literature in connection with a school board election constitutes First Amendment activity. Finally, soliciting persons to make contributions to or engage in campaigning for a candidate for school board constitutes First Amendment activity. Section X(B) of the Personnel Policy thus directly restricts First Amendment rights.

The dispute between the parties concerns the degree of judicial scrutiny to which Section X(B) should be subjected. Plaintiffs argue for strict scrutiny. The City argues that the court should instead engage in the balancing test first enunciated by the U.S. Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). The court agrees with the City on this issue.

As the U.S. Supreme Court stated in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995), government employees "have not relinquished the First Amendment rights they would otherwise enjoy as citizens." 513 U.S. at 465, quoting

---

[6] In this respect, Edwards's experience in December 2010 is instructive. He expressed interest in a school board vacancy until he was advised that the City's Personnel Policy restricted city employees from seeking or accepting seats on the school board.

8

*Pickering,* 391 U.S. at 568. However, the court went on to recognize that restraints may be placed "on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." 513 U.S. at 465.

As the Supreme Court concluded in *United States v. National Treasury Employees Union,* a court considering the validity of a restraint on the First Amendment rights of government employees "must arrive at a balance between the interests of the employee [in engaging in First Amendment activity] and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 513 U.S. at 465-66, quoting *Pickering,* 391 U.S. at 568.

*Pickering* involved the question of whether an employee could be disciplined for First Amendment activity, and many of the cases applying the *Pickering* test have involved a similar disciplinary context. *E.g., Connick v. Myers,* 461 U.S. 138 (1983). In contrast, where a government has instituted a broadly drawn rule that constitutes a prior restraint on the First Amendment activity of its employees, the Supreme Court has placed a greater burden on the government to justify the restrictions in question. *United States v. National Treasury Employees Union,* 513 U.S. at 468 ("the Government's burden is greater with respect to [a sweeping] restriction on expression than with respect to an isolated disciplinary action"); *see id.* at 466-68.

Under the *Pickering* balancing test, the government must show that the First Amendment rights of its employees are outweighed by the potential impact of the First Amendment activity in question on the "actual operation" of the government entity. 513 U.S. at 468, quoting *Pickering,* 391 U.S. at 571. In making this showing, the City of South Portland must meet a greater burden of justification under the *National Treasury Employees Union* decision because this case involves a broad prohibition on political involvement in school board elections.

9

5. Application of the Balancing Test

The governmental interests offered to justify restriction of political activity by governmental employees, as articulated in the Gailey affidavit (¶ 16) and in cases such as *Magill v. Lynch*, 560 F.2d 22, 27-29 (1st Cir. 1977) (Coffin, J.), include the following:

1. to prevent the appearance or reality of allowing governmental decisions to be influenced by political party affiliation;

2. to avoid the danger that governmental employees might be molded into a political machine – a source of manpower and support for partisan purposes or to serve the interests of incumbents;

3. to ensure that governmental employees are evaluated on their merits, free from political coercion from their superiors and from any incentive to engage in political activity in order to obtain advancement or other reward;

4. to prevent the disruption that might result if a governmental employee runs against someone who supervises that employee or runs for an office that would exert authority over that employee's supervisor;

5. to prevent any employee pressure on a governmental employee's personal political decisions;

6. to prevent governmental employees from using their governmental positions or governmental resources (such as their government computers or telephones) to influence or to attempt to influence local elections;

7. to prevent governmental employees from engaging in political activity on "company time"; and

8. to prevent citizens from being subject to politicking at city offices.

The interests identified above, particularly those enumerated as (1), (2), and (3), have been found to outweigh the First Amendment interests of governmental employees in cases where partisan political activity is involved. *See Magill v. Lynch*, 560 F.2d at 25-26, citing *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548 (1973), and *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). The same result would obtain in a situation where, even though elections are nominally non-partisan, political

10

parties endorse candidates and there is considerable partisan involvement in the electoral process. *See Magill v. Lynch*, 560 F.2d at 26-27; *id.* at 29 ("government may constitutionally restrict its employees' participation in nominally non-partisan elections if political parties play a large role in the campaigns").

In the case at bar, there is no evidence that political parties play any role in South Portland municipal elections, let alone in school board elections. Accordingly, the strongest arguments for restricting political activities by governmental employees are absent here. Nevertheless, some courts have held that even in truly non-partisan elections a municipality may restrict the political activities of its employees. *See Wachsman v. City of Dallas*, 704 F.2d 160, 167 (5th Cir. 1983). Other courts have taken a contrary view. *See Fangman v. City of Cincinnati*, 634 F.Supp.2d 872 (S.D. Ohio 2008).

Even in cases where restrictions on non-partisan political activity have been upheld, however, the controlling rationale is a concern that governmental employees will be pressured to work for the re-election of mayors or city councilmen, that governmental employees will be pressured to contribute to the campaigns of mayors or city councilmen, that governmental employees will discriminate based on the political allegiances of the mayors or city councilmen to whom they report, and that citizens will be exposed to politicking by governmental employees. *See Wachsman*, 704 F.2d at 166-67.

Concerns of this nature may justify South Portland's ban on political activity by city employees in connection with city council elections, a ban which has been in effect without challenge for at least 10 years. *See* Gailey Aff. ¶ 19.[7] Those concerns, however, are highly attenuated when applied to city employees seeking to run for the school

---

[7] The application of the South Portland Personnel Policy to city employees who may wish to participate in City Council elections is not before the court, and the court expresses no view on that issue.

11

board or seeking to distribute campaign literature in connection with non-partisan school board elections. School board members do not have any supervisory authority over municipal employees. While city council members would conceivably have the ability to enlist city employees to engage in political activity on their behalf, no such argument can be made with respect to city employee participation in school board elections.

The court is not aware of any evidence of record, any historical evidence, or any suggestion that municipal employees not answerable to the school board might be influenced in the performance of their municipal duties by school board politics or that they might be coerced, rewarded, or penalized in their municipal jobs based on their participation or non-participation in school board elections. Moreover, municipal employees running for the school board or engaging in campaign activity in connection with school board elections do not present the potential for disruption that may exist if an employee were to run against one of his or her supervisors. *See Magill v. Lynch*, 560 F.2d at 29.

While the City Manager also has no authority over school board members, the City points out that the City Manager could be involved in disciplinary proceedings involving city employees, and the City Manager has stated that it would likely be "awkward" if he had to uphold or overturn disciplinary action over a municipal employee who was also an elected school board member. Gailey Aff. ¶ 14. The short answer is that this perceived "awkwardness" is not sufficient to justify restricting the First Amendment rights of municipal employees who want to participate in school board elections. Given that the City Manager has no supervisory authority over the school board and vice-versa, any conceivable "awkwardness" that might arise in a

12

disciplinary situation does not raise the kind of concerns that have been found to justify restrictions on the First Amendment rights of government employees.

The court sees no reason why – in cases where the City Manager is called upon to consider a disciplinary issue relating to a municipal employee[8] – the City Manager's decision would be subject to any different considerations in the case of a municipal employee who happened to be a school board member than in the case of any other municipal employee. The City's argument is even more attenuated in the case of discipline involving a city employee who was not a member of the school board but who had merely distributed campaign literature for a school board election.

While the City Manager also sees a potential for "awkwardness" because the City Manager has the authority to request budget estimates and financial reports from the school board, Gailey Aff. ¶ 23, the alleged awkwardness in that situation is not apparent to the court. Finally, although the City has placed a considerable amount of information in the record with respect to sharing of certain functions and costs by the school department and other municipal departments, none of that interaction, as it is described by the City, poses any potential for politically compromising the efficiency of municipal government.[9]

In sum, applying the *Pickering* balancing test under the circumstances of this case, the justifications offered by the City do not outweigh the First Amendment rights of city employees who wish to be involved as candidates in non-partisan school board

---

[8] There is no evidence in the record as to how frequently or rarely the City Manager is called upon to exercise his authority as the final step in the grievance process.

[9] In defense of its policy, South Portland points out that other municipalities have adopted similar policies. Just because South Portland is not alone in crafting broad restrictions applicable to school board elections as well as other municipal elections does not make its policy constitutional. Moreover, not all of the personnel policies cited by the City support its position. The City of Portland, for instance, allows its employees to seek nomination or election to *"any non-partisan office in municipal government (i.e. City or school office)."* Exhibit P-2 to Affidavit of Portland City Clerk Katherine Jones, Section IX(A) (emphasis added).

elections or who merely wish to engage in campaign activity in connection with those elections.

That does not, however, invalidate the extension of the City's personnel policy to school board elections in its entirety. The City is not entitled to prevent municipal employees from seeking or accepting nomination or election to the school board, from circulating petitions or campaign literature on their own time in connection with school board elections, or from soliciting or receiving contributions or political service on their own time in connection with school board elections. *See* Personnel Policy (as amended November 2011), Section X(B)(1), (3), and (4). However, the City is fully entitled to prohibit its employees from using "the influence of his or her employment capacity" for or against any candidate for the school board. Section X(B)(2). The City is also entitled to prohibit the use of city facilities, equipment, or supplies in connection with any election for the school board, Section X(B)(5), and it is entitled to prohibit any politicking during an employee's working hours.

6.    Management Rights Provision

The plaintiffs also have raised an issue with respect to the management rights provision in the personnel policy. Callaghan's original argument was that although the City Manager had informed her that he had decided that she would be grandfathered "for now", her right to run for election to the school board should not be subject to the unfettered discretion of the City Manager. That issue, however, is now moot in light of the November 2011 amendments to the personnel policy, which clarify that the City Manager does not have authority to waive the restrictions on political activity contained in Section X(B). *See* Gailey Aff. Ex. 3, Section II(B).

14

The entry shall be:

Plaintiffs' motion for summary judgment is granted in part.

For the reasons set forth above, it is hereby ORDERED, ADJUDGED AND DECREED that Subsections (1), (3), and (4) of Section X(B) of the City of South Portland Personnel Policy, as amended in November 2011, are invalid and unenforceable to the extent that those subsections may be applied (a) to preclude employees subject to that policy from seeking nomination or election to the South Portland School Board, (b) to prohibit such employees from circulating petitions and campaign literature on their own time in connection with School Board elections, and (c) to prohibit such employees from soliciting or receiving contributions or political service on their own time for or against any candidate for the School Board.

Accordingly, the City of South Portland is hereby permanently enjoined from enforcing subsections (1), (3), and (4) of Section X(B) of the City Personnel Policy as against employees subject to that policy who may seek nomination or election to the South Portland School Board or who, on their own time, may circulate petitions or campaign literature in connection with School Board elections or solicit or receive contributions or political service for or against any candidate for the School Board.

Subsections (2) and (5) of Section X(B) shall remain applicable to School Board elections and are not subject to this injunction. This order shall not in any way affect the validity or enforceability of any portion of Section X(B) in connection with elections to the City Council or any elective office other than the School Board.

The clerk is directed to incorporate this order in the docket pursuant to Rule 79(a).

15

Dated:        April **17**, 2012

_____
Thomas D. Warren
Justice, Superior Court

16

KAREN CALLAGHAN ET AL VS CITY OF SOUTH PORTLAND
UTN:AOCSsr  -2011-0095138                          CASE #:PORSC-CV-2011-00428
------------------------------------------------------------------------------

01 0000007512            DAGGETT, SALLY
    10 FREE STREET PO BOX 4510 PORTLAND ME 04112
    F      CITY OF SOUTH PORTLAND              DEF      RTND     09/26/2011

02 0000001041            LOURIE, DAVID
    189 SPURWINK AVENUE CAPE ELIZABETH ME 04107
    F      KAREN CALLAGHAN                     PL       RTND     09/26/2011
    F      BURTON EDWARDS                      PL       RTND     09/26/2011